Okay, Madam Clerk, will you please call the next case? 12-1697 A. M. Hewitt v. Fidelity Real Estate Growth Fund II Okay, will the attorneys please step up to the podium. Tell us your names, who you represent, and approximately how long your argument will take. Good morning, Counselor. Good morning. My name is Arthur Hoffman. I represent the appellant. My argument, I expect to take about ten minutes. If I could have five minutes for rebuttal, that would be great. Very good, Mr. Hoffman. Good morning, Counselor. Good morning, Your Honor. My name is Teresa Davis. I represent the defendant at F.L.E., Fidelity Real Estate Growth Fund. And I would like to have ten minutes for my argument. Very good. Mr. Hoffman, you may proceed with your argument. Thank you very much. In preparation for this argument, what occurred to me is there's actually a lot of points on which the parties agree. And I'll briefly run through those. We agree that this appeal concerns an issue of contract interpretation. We agree that Massachusetts contract principles apply here. We agree that under Massachusetts contract principles, the best evidence of the party's intent is the words that they choose. We agree that under Massachusetts contract principles, those words must be given their plain and ordinary meaning. We agree that here, the parties could have chosen a number of different ways to measure sales performance. They could have chosen terms like net sales, net sales proceeds. There could have been any number of ways to get across the point of net if that was their intent. But the word net never appears in the contract. The word that appears in the contract is gross sales and gross sales prices. And that is a term that has a plain and ordinary meaning. A gross sales price is a total purchase price, a total sales price without reductions, without allowances like trade-in allowances. And thus, if you apply that plain and ordinary meaning here, the appellant sold $5,019,500 worth of units and met the sales benchmark that was required to be met. The reason why summary judgment was entered here was because the trial court came to the conclusion that it would have been more logical for the parties to measure sales performance by some type of a net measurement tool, something like net sales proceeds or net sales prices. And so in the trial court's view, he should ignore the plain meaning of the term gross sales price and apply net sales price. But that ruling conflicts with Massachusetts contract principles. The trial court did not have the discretion to apply anything other than the plain and ordinary meaning of the term gross sales price. Indeed, if the parties wanted that term to have any meaning other than its plain and ordinary meaning, they could have defined the term in the contract. There were plenty of terms in this contract that had special meanings given to them in a definition section. Well, you're talking about the $70,000, right? Correct, the trade-in allowance. The trade-in allowance. And with regard to the trade-in allowance, there was an opportunity that Fidelity presented that allowed the borrowers to identify any transactions during the cure period. And there wasn't any. There was silence. So why shouldn't you be a stop? Why shouldn't a stop be applied to that argument? Because during the time, nobody said anything about this exchange. And now you're bringing it up when Fidelity relied on it in good faith during the period of cure. There's plenty of reasons why a stopple shouldn't apply here, especially because a stopple is generally an issue of fact and it has multiple elements, and virtually all of those elements involve issues of fact here. When Your Honor is talking about the time that Fidelity said, tell us if there's something wrong, we're talking about a matter of hours. They said, tell us what's wrong with our own summary. In other words, they presented us with a summary of what they thought were all the sales, and now we're given a matter of hours to figure out where their own mistakes are. And we did find some of those mistakes quickly and identified them, and their own chart was corrected in that respect. But to find this mistake involving the transaction involving the parking units, it took a long time to find that mistake. And I don't see why the plaintiff should be penalized, because it took us a long time to find Fidelity's own mistake. Well, where's the mistake? I mean, you can't, otherwise you're counting it twice. I'm sorry? I don't understand what, you say it's a mistake. The mistake was their chart didn't have that transaction on it at all. It's not like they had that transaction on the chart, and they had listed next to it $25,000 instead of $95,000. That would have been a mistake we could readily identify. But their chart didn't have that transaction on there at all. But whose burden is that? They're the ones that were claiming there was a default. Well, but for you to show that you had the $5 million threshold. It's not for them to say. It's your burden. If they think we didn't make the threshold, it's up to them to say, here's all the transactions we think occurred over the last year. Here's what we think the gross sales prices were on these transactions, and it's less than $5 million. And then now it brings on you to come forward, and you didn't come forward and say anything about that $70,000. You said about some other things. But the fact you didn't do anything, and then they proceed with the action. I think it's an overstatement to say that the plaintiff didn't do anything. The plaintiff didn't catch Fidelity's mistake in the matter of hours that we were given. Again, you say it's a mistake. I don't see how it's a mistake when this wasn't new money. This was, and they gave you the credit, $25,000. I mean, otherwise you're counting the $70,000 twice. You can't sell the two spaces for $80,000 and then add another $70,000 and then add a $25,000, you're way over what is happening here. That's not reality. I'm not taking that position. I'm saying the chart that they provided did not say we're giving you credit for $25,000 for this transaction. The transaction didn't appear on there at all. But if you get the $25,000, you're still under the $5 million. But the $25,000 is a net figure. It's the total purchase price minus the trade-in allowance. That's not a gross sales price. That doesn't meet anybody's definition of a gross sales price. It wasn't a sale. Was it a sale? Sure, it was a sale. All the contemporaneous transaction documents refer to it as a sale. All the contemporaneous transaction documents refer to it as having a purchase price of $95,000 and a trade-in allowance of $75,000. I'm sorry, $70,000. A trade-in allowance. So you can't count the allowance twice. The $70,000 came in at a different period in time. The whole intent here was to get $5 million and more money. Isn't that true? Isn't that what was tried? They would forbear as long as you brought it, somebody brought in $5 million, right? I would say the goal was to demonstrate that we could hit that type of sales figure. Not that type. $5 million. That was not the number that was going to Fidelity. Fidelity was a second lien holder. It doesn't matter. The fact is the forbearance agreement used the number $5 million. It didn't say about $5 million. It didn't say under $5 million. It didn't say above $5 million. It said $5 million we will forbear. Is that right? It does say that. Okay. So the question is, did they reach the $5 million? And in order for you to get there, you have to double-count the $70,000, which came in at a different period. It had nothing to do with this period of time. These people were just exchanging for a different space and paid $25,000 extra, and then the other spaces were sold. So you can't have it two ways. It seems to me you're trying to have it twice. The only way you could say we're trying to have it twice is if the sales goals had to be met by determination of proceeds coming in. That was not the sales measurement tool. The sales measurement tool was gross sales prices. And when those parking units were sold in the relevant period for $95,000 and all the transaction documents say that's the sales price, then that's the sales price. It's not a question of double-counting. It would only be a question of double-counting if the sales measurement tool was based on net. But it's not based on net. It's based on gross. And every time Fidelity did a chart, they always listed the total purchase prices. Not total purchase prices, less any kind of reductions or allowances. There were always all kinds of reductions and allowances with all these transactions. And nobody prepared charts to say, okay, let's go through the transaction documents and see was the buyer given some kind of a credit here? Was a reduction allowed here? Was an allowance allowed here? Fidelity can't go back and rewrite the contract now and say, you know, it would have made more sense to measure the sales by some type of a net figure. That wasn't a term that was agreed upon. And I don't think one can go back and try and rewrite the contract because maybe it would have made more sense to structure the contract that way at the beginning. But, of course, if the contract was structured along terms of net or proceeds or something like that, there wouldn't have been a $5 million number. It would have been a lesser number. The reason why the number was so high is because, of course, the number is going to be high if you're talking about gross sales figures. Counsel, just clear something up for me. Is it true that Fidelity got all of the figures from the borrowers that they put in the chart? Is that where they got the information? I'm sorry. I didn't ask. I said did Fidelity get the information that they had on the chart from the borrowers? Didn't you provide them with information concerning your sales? No. Fidelity got the information from the Near North Equity, I think. It was the company that was involved in managing the sales. In other words, every time there was a sale, Fidelity would get copies of the transaction documents so that they could keep track of everything. And they got copies of these transaction documents also. We demonstrated that in our brief, even though they submitted an affidavit saying they never knew about this transaction. We demonstrated that absolutely they knew about it. In fact, they got a check out of this transaction. They actually received a partial payment when this transaction closed. And the notation, it was a wire transfer, and the notation right on the wire transfer demonstrated that it was their share of the proceeds from the sale of two parking units. So they knew about this transaction. They weren't depending on my client to provide them with the data. They had a chance to keep a running total all the way through. And although His Honor is correct that the contract talks about a $5 million requirement, there's plenty of law in Massachusetts that says substantial compliance is an issue of fact. And there's plenty of law in Massachusetts that says where you have a contract that is substantially complied with, the other side of the party, the other side of the transaction might have a claim for damages, but they don't have a right to just terminate the contract. And that's what happened here. You're talking about the LESIT case? Yes. But the LESIT case was different in that both sides there were in default. That's not the case here. So I don't see how you can apply LESIT. I'm not suggesting that the facts are the same. I'm talking about LESIT is one case out of a number of cases that say, as a principle of Massachusetts contract law, that if one of the sides is in breach, but it's not a breach that goes to the very heart of the transaction, the other side can bring a claim for damages, but they don't have the ability to say, I'm just going to stop performing. Well, wait a minute. That's not limited to the facts in LESIT. The whole question here is to get $5 million. You didn't get the $5 million. The LESIT case, if it doesn't support you, what case are you relying on? I mean, that was a case you seemed to be relying on most of all. So, you know, it's a different situation in LESIT. I mean, the facts are very different because both sides were in default. Here, there was a default. Okay? They didn't have to forbear. They decided to forbear. Now, there are many reasons why, you know, you shouldn't get a, you know, if you can't, you didn't make it. They set a line, a red line, and you didn't make it. Okay? Why should that be ignored? I don't see anything under Massachusetts law that would say, and I don't think LESIT applies here, that under these circumstances, that you coming close is good enough. What's your response? Well, my first response is we did make it. We made it by $19,500. So, we didn't breach. Well, that's if you can't account. If the trial court's interpretation of gross sales prices, some type of net term, was to stand, it doesn't mean that because your sales were $4,949,500, that that gives the other side the ability to just terminate the entire contract. The principle of law under not just LESIT, but LESIT says a material breach is a breach of an essential and inducing feature of the contract, and only a material breach justifies a party in rescinding it. The point of LESIT was if you have an insignificant breach, an immaterial breach, you can bring a claim for damages, but it doesn't allow you to say I'm rescinding the contract. Counsel, explain this to me. The forbearance agreement indicates that as of December 31, 2009, you were supposed to have $5 million in gross sales, correct? Correct. So, the $5 million doesn't mean $5 million? We have to determine whether or not there was a material breach? It says $5 million. Why do we need to go any further than this forbearance agreement? Because the whole reason why there's a target set like that is to demonstrate that these guys can sell. Does the forbearance agreement say it's a target? It says $5 million. It does. Does it say we're going to try to get there? It says $5 million, we'll forbear. It does. Here's what the forbearance agreement doesn't say. It doesn't say if you're one penny short or $10,000 short of $5 million, the whole contract gets rescinded. These are sophisticated parties. If there was supposed to be a strict compliance standard, that could have easily been written into the contract. It wasn't. So, because there is not a strict compliance standard written into the contract, the fallback position is you go to Massachusetts Principles of Contract Interpretation, and Massachusetts Principles of Contract Interpretation say in order to rescind the contract, there has to be a material breach. And being $50,000 short, and I don't believe they're short at all, but if the trial court's interpretation of the term gross sales price is upheld, it means that the plaintiff was $50,000 short on a $5 million requirement. Under Massachusetts law, I can't believe that that would be deemed a material breach such that the party has the right to rescind the contract as opposed to bring a claim for damages. And that's the standard that's set there. That's the standard that we're dealing with. Can you explain to me then how the forbearance agreement states, upon any event of default other than the existing defaults, which meant the past defaults. Correct. Lender may, in its sole discretion, exercise any rights and remedies under the loan documents or otherwise, which is what they did. So you're saying that we are to ignore the language of the forbearance agreement. Is that right? No, sir. Well, how can we not ignore it? They decided, Fidelity decided to exercise its rights and remedies under the loan agreement. So you're saying, well, they can't do that because it was only less than 1% short. Right, because Massachusetts law, which applies here, says only a material breach can be a basis for rescission. If they didn't want that standard to apply. That's not what the agreement says. The agreement says it's in the discretion. It says the sole discretion may exercise. So you're saying that the Massachusetts law reads out whatever the contract might say, even though the contract said in its sole discretion. It has that discretion. Under your reasoning, Massachusetts law would override any agreement between the parties as to what might occur. No, if the parties said in plain and simple English, even 1 cent short of 5 million is grounds for rescission. We're going to have an absolute strict compliance standard, which could have easily been put in there. Absolutely that would overrule the general rule in Massachusetts that only a material breach is grounds for rescission. But that's not what the contract says. Thanks. I'll save the rest of my time for rebuttal. Thank you, Mr. Offit. Avis. Good morning, Your Honors. May it please the Court. The circuit court did correctly hold that the January 2009 parking space exchange did not qualify as a sale under the plain terms of the forbearance agreement. As counsel pointed out at the beginning of his argument, this is an agreement that the Court ruled correctly was an unambiguous agreement. As such, it was the Court's duty as a matter of law to interpret the terms of that agreement. The principal purpose in construing the contract is to ascertain and give effect to the parties' intent at the time they entered into the agreement. And it should be construed in reference to the situation the parties were in and the objects that the agreement sought to accomplish. So in this case, the operative words are gross sales, right? Gross sales price, correct, Your Honor. That's their argument. Gross sale for that space was $95,000, not $25,000. That's his argument. So you can't have it both ways. If it's gross, then it's $95,000, right? Actually, I do not agree with that, Your Honor. I think you have to take the term gross sales price in context based upon the intent of the parties and the goal that they were seeking to achieve with the forbearance agreement, which was to bring in money that could be applied to the loan that was in default at the time that they entered into the forbearance agreement. His point is that could have been dealt with, but it used the word gross. So what you're saying is, well, we're going to talk about net for purposes of this transaction, not gross. Well, I don't think that we are talking about net because that was a term that was defined in the forbearance agreement. A net sales price was defined as all monies paid in connection with the purchase of units, less closing costs. If you take that definition and apply it to gross sales price, that would be all monies paid in connection with the purchase of units, not excluding closing costs. That is a common and acceptable definition of gross sales price and one that makes sense under the terms of the forbearance agreement and the purpose for which the forbearance agreement was entered into. First of all, Your Honor, I don't think an exchange of something counts as a sale at all. But even if it did, I think you need to take the definition of net sales price that was specified in the forbearance agreement and apply that to gross sales price. And as Your Honor pointed out, the borrower cannot, as they say, have his cake and eat it too. They had two parking spaces that had been previously sold in 2007 for which the borrower obtained $70,000 in proceeds from the purchaser. The purchaser wanted different parking spaces that cost $25,000 more. So he exchanged those two parking spaces and bought two other ones paying the difference of $25,000. So the gross price really was you take these two spots plus $25,000. So the two spots were in cash, obviously. The only cash was the $25,000. Yes, the proceeds that came in, the gross sales price for this transaction was $25,000 if you can call it a sale at all. And by the way, Your Honor, there wasn't just a matter of hours that the borrower had to address this situation. The borrower had three months where it was represented by counsel in negotiating the forbearance agreement in which the borrower had listed every sale that had occurred from January 1, 2009 through the date that they documented the forbearance agreement. Notably, this parking exchange was not included as a sale that should count. How do you explain Mr. Altman says hours and you say three months? I mean, that's a big difference. Well, actually, it's even longer than three months. Well, then what is he talking about what could be in hours? I mean, is it so far apart that somebody is talking apples and somebody is talking oranges? Well, I think if you look in the forbearance agreement, you will see that in Section 21, I believe it is, they list the sales that should be counted, yes. Paragraph 21, confirmed unit closings. These are the gross sales prices that have occurred for unit sales since January 1, 2009. It lists four transactions, Unit 3501, 3502, 2102, and 1702. And lists the proceeds that had been received in connection with those sales. Notably, parking units 608 and 609 are nowhere to be found in this agreement. This was an agreement that the parties started negotiating while represented by counsel in May of 2009. It was documented in July of 2009. And never once was that parking space exchange brought up as a sale that should count to the aggregate sales goals. Then, when the borrower had defaulted by over $500,000 as of December 31, 2009, 10% and was given a 30-day cure period, Fidelity sent them a letter notifying them of the default, notifying them of the cure period, and stating these are the transactions that we have counted towards the aggregate sales goal. And you are $503,000 short. That was on January 4th. Thereafter, they made one additional sale that got them closer to 1.459, whatever that number is. But still did not, I'm sorry, 4.949. But still did not meet the $5 million sales goal. They had 30 days to cure the default. They did not. It's as simple as that, Your Honors. And during that 30 days, they could have raised this issue and said, wait a second, we forgot to add this in the forbearance agreement. We forgot to ever tell you about it. But all the same, we think it should be counted to the aggregate sales goals. So let's talk about it before you go and exercise your rights. But they did not. Fidelity again sent them a letter the end of January saying, you still have not met the sales goal, and we intend to file a deed in lieu. They sent them another letter February 2nd stating, we're accelerating all your debt. We intend to exercise our right to file the deed. Still no response. It was not until February 3rd, one month after the initial letter was sent, with the sales listed, that Fidelity finally exercised its right, a right expressly agreed to and provided for in the agreement, and exercised the deed in lieu. As for the materiality issue, Your Honor, I think as Judge Neville pointed out, it is not, there is no Massachusetts case, no Massachusetts law that says that materiality, the sole factor of materiality is a quantitative analysis. What Massachusetts law does say, and what the case that plaintiff greatly relies upon specifically recognizes, that being leased, it says that a material breach of an agreement occurs when there is a breach of an essential and inducing feature of the contract. Undeniably, the ability for the borrower to meet its sales goals, to meet its ability to repay the loan, and to meet these specific sales benchmarks that had been set and negotiated by the parties in the agreement, was an essential and inducing feature of the contract. As Leisit says, the breach of that obligation went to the very root of the contract, and that is the definition of a material breach. As for whether or not there was a strict compliance standard for negotiating under the terms of the agreement, I would respectfully disagree with counsel. I think if you look at paragraph 2 of the forbearance agreement, the second paragraph of the agreement, it says that fidelity would forbear from exercising the rights and remedies that had accrued as a result of the borrower's already admitted breaches of the loan agreement, provided that no forbearance default occurred. Paragraph 7 lists borrowers' failure to achieve any of the aggregate sales goals as and when specified as the very first forbearance default. Paragraph 2 further states that... What you're saying is that the materiality argument is of no moment. It's of no moment. There's no quantitative feature here. There is no argument that this was a central purpose of the agreement, and their failure to meet that obligation was a material breach of the agreement. As for the equitable estoppel argument, I think Your Honor is absolutely right. There is no excuse for the borrower's failure to bring this issue up if they believed honestly and in good faith that this parking space exchange should have been counted towards meeting the aggregate sales goals. Fidelity took great measures to take over the management of the condo building, to take over all of the responsibilities that are associated with the management of the condo building, and it was not for six months thereafter that this parking space exchange was first conjured up and asserted as a reason why Fidelity should not have exercised the deed in lieu foreclosure and that the borrower had ostensibly met its $5 million sales goals. A party cannot wait for six months, let another party take great actions at great expense, in good faith, relying upon the plain terms of agreement, and then assert six months later, oops, we got you, you didn't count this, and therefore you owe us millions of dollars in damages because you exercised a right that you thought in good faith, based upon the plain terms of the agreement, you had a right to do. That simply is not equitable, and the concept of equitable estoppel clearly applies here. Unless your honors have any further questions, I will rest on our brief. Thank you very much, Ms. Davis. Mr. Hoffman. The notion that this transaction was simply an exchange and not a sale is really ludicrous. If someone comes into a BMW dealer and says, here's my trade-in that's worth $70,000 and here's $25,000 in cash, if you want to call that an exchange, call it an exchange. It doesn't change the fact that it's a sale, and it doesn't change the fact that if the salesman's performance is being judged on how much in net sales he brings in, you call that a $25,000 transaction because the total purchase price minus the trade-in is $25,000. But if you're judging his performance based on gross sales price, which is the measurement term here, it's a $95,000 sale, plain and simple. And the notion of whether my client should be equitably estopped because of the time that went by before we found out Fidelity's own mistake in calculating the total gross sales, let's just run through the elements of equitable estoppel here. The first element, respondent undertook words or conduct that amounted to a misrepresentation or concealment of a material fact. There's neither here. My client didn't misrepresent anything to Fidelity, nor did my client conceal anything from Fidelity. And in that regard, the Park case makes very clear to benefit from equitable estoppel, the movant must have had no knowledge or means of knowing the true facts. Fidelity got transaction documents on every one of these transactions. They had at their disposal all the same transaction documents that my client had. They're the ones who chose to add up all the documents, declare a default, and proceed on the deed in lieu of foreclosure instead of taking the time to sit down with my client and go through all the documents, especially because they knew how close it was to the $5 million benchmark or requirement, whatever term you want to use it for. They knew how close it was. They could have taken the time to work with my client and figure out, are we just a hair under $5 million? Are we just a hair over? But they decided not to do that. After a month went by and we had already pointed out some mistakes that they had already made, we got a letter on February 1, 2010. This is, again, after we've already identified a number of mistakes in their calculation that says, hey, you have now until no later than 5 p.m. Eastern time today to point out any more mistakes. It took longer than that to find this mistake. You have months to do it. So they're telling you, okay, now this is the deadline. I'm sorry, we had how long to do it? Apparently you had months. You've been negotiating for months. No, the default was declared on January 4. The letter is February what? February 1. Between January 1 and February 1, we found three mistakes that they had made. Well, you didn't find this one, apparently. If you thought it was a mistake, maybe you didn't think it was a mistake. But that doesn't constitute an equitable estoppel. That doesn't constitute a misrepresentation or a concealment, especially when they're in possession of the same facts we are. They should have been looking to find their own mistake themselves. Again, it depends on how you characterize it. It does. Unless you have any questions, that's all I have. Thank you very much, Mr. Hoffman. Ms. Davis, let me compliment you on your arguments and on the briefs. This matter will be taken under advisement, and this court stands in recess.